May it please the Court, my name is Adam Carter and I'm with the Employment Law Group. I represent Paul Feldman, the appellant, and Tom Harrington, my colleague, is with me at Council Table. I thought I would address the Court's concerns from Thursday's order and then move on to the facts that a reasonable jury could rely on. There's no issue raised below regarding exhaustion or relation back. No dispute that Mr. Feldman was fired on August 27th of 2009 and then he filed with OSHA within 90 days, 82 days later in fact, on November 17th, 2009. Then, according to SOX, you have to have it rest with OSHA, with the Department of Labor, for 180 days and he did that. The 180th day is May 16th, 2010. He filed a notice of intent to go to federal court, which he's allowed to do, and that was on May 7th and then it wasn't until June 7th of 2010, after the 180 days. So he sent his notice on November the 17th. You didn't file your lawsuit January the 8th and you have put it in the vein that you have 180 days, which of course January the 8th is not, and you wait 180 days and you filed an amendment. And under Rule 15, an amendment relates back. But sir, there's no statute of limitations that you're concerned about because... No, I'm not concerned about statute of limitations. I'm concerned about jurisdiction. You can't file this until 180 days from the date of it. And if it relates back under Rule 15, that's not 180 days. The 180 days ran on May 16th, 2010, and then we didn't file until the 180 days was over on June 7th, 2010. But when you filed it, what you filed was a Rule 15 amendment, not a supplemental pleading. I'm not sure it matters. One relates back as though it was filed back then. If it relates back, that's the purpose of the statute of limitations, relates back to the time when you first filed it, which is January the 8th. That's not 180 days. You see where I'm going with this? Oh, I see. You're saying that if it does relate back, then it's too... Under Rule 15, it has to relate back. That's the reason you got it. That's why people like an amendment because they want to beat the statute of limitations, so they say relate back to the date that it was filed. So you file something in May under Rule 15 as an amendment, court grants it, it relates back to January the 8th. January the 8th, the court did not have jurisdiction over this claim. Well, I think that I'm interested in that. I'll be briefing it, Your Honor. But it's not an interest in it. I'm trying to understand, is that not correct? I don't think it is because... What is not correct, that you file for an amendment or that it relates back? What is not correct? It's true that we filed an amendment. I don't think that it just ipso facto goes back to being filed on... Does Rule 15 say that? Well, that's for purposes of... I think it's a fiction that would ploy so that those claims can then be covered by the statute of limitations. In this case... You have an out if it's a supplemental pleading. And when you're looking at it, look at it from that perspective. But I don't think you have an out under Rule 15. Because if you do, then that's not something you just willy-nilly just say, well, this time it relates back, this time it doesn't. Rule 15 says it right there. I understand Your Honor's point, and we will be briefing it. I frankly didn't understand it with the application of SOX because there is no statute of limitations. Apparently nobody did because nobody brought it up. But we have to because it is jurisdiction. If the court doesn't have jurisdiction, it has to be dealt with. I totally agree. And I think that there's no question that the court had jurisdiction because we brought the claim after 180 days in federal court. If Your Honor's point... What you brought was an amendment to the claim. Yes, that's true. An amendment. You didn't bring a new claim. You brought an amendment to what was already there. An amendment relates back. It was, in fact, a new claim. But you called it was an amendment, and the court granted you an amendment. That's true. And if Your Honor's point is that we had to do a technically separate case and file a totally separate case rather than merge it in with the existing case... My point is that there's an administrative, exhaustive administrative remedy provision on the SOX. And in order to get that, if you filed it on January the 8th as a related back claim, that's not 180 days. I understand Your Honor's point, and we will be briefing it. I think there's some authority out there that I've seen on this point, but it's not at my fingertips. And as you research that, and you don't have to answer this because, as you said, and I think it's a point well taken, you're still in the process of briefing it, but answer this in terms of a question of a concession. If you had not filed an amendment, do you concede that you would have a jurisdictional problem having filed it initially before the 180 days? Would you concede that? You don't have to answer unless you want to, but I'm saying please answer that in respect when you file your supplemental 28-J brief. I will. But you can go ahead now if you want to venture into it. Well, I now understand the issue, and I... That's why I sort of caught you by back because you didn't, but that's really an important question in it because that really relates to your argument what relation back really means. I think where it takes us, though, is it takes us to the point that it's a technical form of pleading rather than filing a completely separate action. But I understand Your Honor's point in admonition, and we'll be briefing it. Any questions? I think the Court is finished with jurisdiction. You can proceed at least today as if we do have it. Let me move on then. So Mr. Feldman blew the whistle on December 27, 2007, and soon thereafter Mr. Rand told Mr. Carrington there was this issue of false minutes. The retaliation began right away. He wrote to the Commerce Department to self-report regarding export violations on January 14, 2008. There was Mr. Littman's email from March the 6th, and soon thereafter there's all this objecting to leaks. There's the hiring of Mr. Finkelstein. Of course, you have to look at this in the context of what it is. I mean, you've got to look at this board. You've got a 3-2 board, three of them diametrically opposed to the other two. It just so happened your client is one of those two who are part of the corporation. And so when you look at it in that light, he files what he says is a notice to Oshoi. He meets with this clue, I guess. And he doesn't report it to the board because he says the board is leaking this thing or whatever. No, sir. That's not quite right. He did tell the board on December 27th. It depends on whose minutes you read. That's true, but we have to take – Minutes adopted by the board, which is that three, did not exactly put it that way. Right, but aren't – at this stage, I think all the facts have to be taken in the light most favorable to Mr. Feldman. I don't know if you take the minutes. Sure. Because the minutes would be – what the minutes are would be what the board adopted. There's nothing favorable about that. That's just what the board adopted. Now, that could mean somebody else took minutes, and you say those are the minutes. No, there are competing minutes from that December 27th. There's only one set that's been adopted. No, as I understand, no set was adopted from that meeting, and then later on minutes were adopted by a vote of three to two. But as I understand it, and the factual – certainly the fact is that – and Mr. Littman, I concede, did not write down we told them about, but his recollection and his sworn testimony is that on December 27th, they did tell them about the need to self-report, and it was about Carrington and about safe source and all of that. So in the light most favorable to my client at this point, and with the lowest possible causation standard that the courts – sorry, that Congress has invented with contributing factor, Judge Dorsey has called it a drop in the teacup. Can we not conclude that he has made his prima facie case, shift the burden now under Sarbanes-Oxley to the employer to prove by clear and convincing evidence? And the district judge just never got there, and so – Where has he made his case that this was a contributing factor? So all the other factors have been met, that it was protected activity and the board knew about it. That's true. So we've got all those things, and so then it just boils down to causation, and causation can be – the district judge was fixated on temporal proximity. Well, as we know, temporal proximity is just but one way you can prove causation, and the opposite is not true. If there's no temporal proximity, that doesn't mean that there is no causation. You can still prove causation without temporal proximity. And so what we have here is we have a situation where there is the board, the majority of the board, outside directors, sitting and waiting for their first opportunity, and when the – 15 months? It was. It was from May of 2008 until August of 2009, and it was in April of 2009 that the so-called Wortley deal went down, and then when they found out, or so they thought, again, the facts in the light most favorable to my client, is that he did not undercut the board with the Wortleys. And so they were waiting for their first opportunity. My point is with the standard as low as it is, and I implore the court to look at the Aurelio decision from the Third Circuit and the Lockheed Martin that I included in my 20HA letter. Those are two very, very good cases. You don't need to show motive. You don't need to show that. And Lockheed Martin stands for the proposition that when the temporal proximity, when the adverse retaliation happens close in time to the protected activity, but the ultimate termination decision happens months and months later. In Lockheed Martin, it was 20 months later. That was not fatal. But in the context, Mr. Carter, although you're not prohibited from filing under SOX, obviously, but you come at a different situation. Your client is the CEO. You're on the board. You almost say who's greater than he is. Of course, you would say because he's on the 3-2 minority side, but he's not the typical employee, and then you have flagrant insubordination, don't you? No, sir. If anything else, the facts in the light most favorable to my client, and I think a jury would conclude, he's doing all the things that a responsible CEO would do. Let's just unpack it a little bit. The ruling sent out a letter to the three members of the board telling them they ought to resign. And let me tell you what that's about. They're not meeting their obligations under the audit committee charter. This is a publicly traded company. They have to do that. He's also telling them they need to get involved with the company. And most importantly, when he's trying to physically get them away from Carrington, who's a criminal, and he's trying to physically distance himself from them, move out of their offices, get away from them, get them into offices and space that is better for the company. It really all comes down to your client and Carrington just didn't get along. They had such a wonderful relationship, and that characterizes a father-son relationship, and they fell out after Carrington decided to sell this stock company to Raymond James, and your guy just kind of did a 180. No, and I embrace that. That's all true. And the reason is really just that it really comes down to if you look through this thing, it's really something your client has against Carrington, and he is upset at anything that tends to favor Carrington. That's not the point that Your Honor should focus on with respect. The dialing it up, I mean, yes, he's upset about the selling of the stock. That's true. There's the district court preexisting contention. Fine, all true. But when you dial it up to the point you're ratting out this guy who's going to be going to jail, there's a raid on his company, the directors who are loyal to Carrington take it out on my client, and they wait until their first opportunity, and they fire him, and it's not insubordinate. Well, the whole ratting out doesn't start until after you start having problems with Carrington. I mean, this company is supposedly selling stuff to this, what is it, SAFE, S-A-F-E? SAFE. And then all of a sudden after he starts having problems, he then discovers you've got potentially a violation of the previous order that puts him in violation of the export for that company. Then he decides that it's time now to go and report this. He learns in December, and he tells the board in December. It's all the same month. And he is doing what a responsible CEO of a publicly traded company would do, which is to get away from the guy who's had them violate federal law. He's told the Commerce Department about it. The Commerce Department comes in and raids, and then immediately objecting to the false minutes, the false billing, and all of these other things. It is certainly possible that a reasonable jury could rely on these facts and conclude that my client was the whistleblower. Why would the attorney for the corporation of Mark Finkelstein take false minutes? He didn't become the attorney for the company until the March 2008 timeframe, and the competing minutes preexisted that. But what originally he was hired, according to my client. It's a pretty strong statement to say that a lawyer who's at a meeting, and he's representing a corporation, and even in whatever capacity he was there, in some kind of representative capacity, would take false minutes. That's right. And it implies a books and records violation of the Securities and Exchange Commission, and it's covered by SOX. I take it you reported that, too. That's right. To the state bar and a whole bunch of people. I don't believe there was a bar complaint, but it implicates SOX because it is a books and records violation of a publicly traded company. I notice I'm out of time. All right. Thank you, Mr. Carter. Thank you. Ms. Jenkins. Good morning. May it please the Court, Amy Jenkins here for the Appellees. Let me first start by addressing the merits, if I may. I think, first and foremost, the district court grant Do you want to address jurisdiction at all? I'd be happy to if Your Honor would prefer I start there. If you are, that would be, I think. Okay. Will do. I misinterpreted or interpreted differently the Court's question last week, just as Mr. Carter did. So I think I have two responses to the jurisdictional issue. First, if you look at it the way the Court just questioned about it, then correct. If it does relate back, if the June complaint relates back. Is it a Rule 15c amendment? That's what the district court said. But I do not believe it to be. 15c relate back? This is not 15d? I do not believe that 15d fits. Any of the parameters fit. And here's why. I realize that. I didn't challenge it either. No, I didn't. But I did raise latches and statute of limitations as a defense in my answer. Not on appeal. Not on appeal. You're right. Let's not talk about that. Let's talk about jurisdiction. Okay. Because jurisdiction, you can raise it any time. Correct. And I think that if the statute of limitations is jurisdictional, the Court could raise it or a party could raise it now. If the statute of limitations is jurisdictional. And I'll tell you the difference. This is a question of whether in filing the amendment on a Rule 15c, it relates back to January 8th, which is not 180 days as required by SOX, in order to be able to bring an action to district court. So district court does not have jurisdiction on January 8th if it relates back to January 8th, you don't have jurisdiction. That's correct, Your Honor. There was a different interpretation I took of your question, if I could address that. Well, get the one that I just gave right then. Yes. That's the one I want you to answer. Yes. If the district court said that it related back, then there was not yet jurisdiction with the district court because 180 days did not run. It was not ripe yet. That's why I'm kind of – the statute says it's relating back. The district court doesn't say that. The district court says it's Rule 15c. That's what they ask for. That's the problem. And so I agree with Your Honor that it does not appear to be ripe if you look at it from that perspective. There's a different perspective that I took when I read your question. I thought you were asking a different issue, and that was if it related back based on 15c subpart 2, which would require that the new claim be substantially arising out of the conduct alleged in the first complaint. I don't think it does, and I'll tell you why the complaints are so drastically different. But assuming that it did not relate back under 15b subpart 2, I think there's a statute of limitations issue then that comes about under 28 U.S.C. 1658b. And I'm happy to address all of that, but if that's not the court's question, then – It might be something interesting to address. Okay. The question is, does it arise under 15d as a supplemental plea? Then it's okay. Correct. If, however, it was under a 15c relate back, and we looked at 15c subpart 2, the new claim was drastically different than what was alleged in January of 2010 in the original complaint. The original complaint said nothing about the essential facts that would support a Sarbanes-Oxley claim, nothing about publicly traded, nothing about fraud, nothing about false SEC filings, nothing about protected activities or knowledge thereof, nothing about reasonable belief, contributing factor or any of the things you would expect to see in a Sarbanes-Oxley claim. So if this was a relate back issue under 15c, I purport that it was not something that should have properly related back to the original complaint because they are so drastically different. You get no hint of a true Sarbanes-Oxley allegation until you get to the June 2010 complaint. Then the question becomes, was that file timely under applicable statute of limitations? As the court knows, Sarbanes-Oxley does not contain its own statute of limitations in 1514a. So then we say, where does the statute of limitations come from? I purport that there must be one because otherwise somebody could file a claim with OSHA, wait 180 days, give notice of removal to federal court and then sit on it for 10 or 20 years. And that's surely not what Congress intended. In fact, this court in the stone versus instrumentation lab case, which was argued by Mr. Carter talked about how socks cases come from back patterns where time is of the essence. So surely there is a statute of limitation. And that really goes beyond what we've asked you to do. And I will brief that your honor. I do think there's an interesting question there. And I thought that's what you were asking. Bring that up. So you didn't bring this up either, but we put this out because it's jurisdictional. And I think the question that you have to decide is why should we not treat this as a supplemental pleading on the 15d, which then sort of gets us there. And it may well be that's the answer to this, but the other business you're giving is wonderful. Would have been nice for you to brought that up in your case. You didn't. And I don't think that's something we need to get into at this point. Sure. Your Honor. I'd be happy to brief that. I don't think it's waived. It was something that was in my answer and, and it was not something that I were the district court addressed. I addressed the merits. And so I'm happy to address that as well in my brief. Judge Winn gave you sound, cogent advice, but I must say my curiosity has got the best of me. Can you give me 10 seconds? Where should we borrow that statute from as you were setting up for? I think the applicable statute of limitations, 28 USC, 1658 B. The Ellis court, which was a district court in Texas used that in a 2008 case. And if that's the applicable statute, then the statute ran from may one, 2010, which would be the two year outer limit from the discovery of the alleged fraud. It was not filed by that date. It could have been had the OSHA complaint been filed earlier. And I will brief that from common law frauds in terms of discovery, that kind of thing could have been discovered. Well, the, the, there are published cases out there that say 1658 B runs from the discovery of the fraud, the alleged fraud, not from when an injury occurs later. So the alleged fraud, the latest it could have been discovered was the may one 2008 Finkelstein invoice. Two years from that would have been the statute of limitations of may one, 2010. Thank you. You can proceed to the merits now. All right. Thank you, your honor turning back to the merits. I think first and foremost, there is no issue before the court with respect to the individual Apple lease. The district court found that there had been no proof that they violated Sarbanes-Oxley and granted summary judgment in their favor. I think that that decision obviously is not up for debate here and should stand. Secondly, the district court ruling on elements two and three of the prima facie case has not been addressed on appeal by Mr. Feldman. And so I think the law stands or the decision stands that with respect to element two, um, LEA had no knowledge of alleged protected activities after may one, 2008. And that's important if we go to the statute of limitations issue. And as to element three, the only adverse employment action was the termination, August 27th, 2009. So I don't believe those issues are up for reevaluation here. The district court ruled and they were not appealed. What the district court did address on the merits was the fourth element, which was contributing factor. Well, let me make sure I understand on the, on the first three elements, you said the district court rule. I thought the district court has simply assumed the district court made a ruling on elements two and three, which were not appealed by Mr. Feldman. And so I'm just saying as to those elements, those two, those two, correct. I think the simplest and easiest way for this court to address the merits is the element for the contributing factor. And the district court found that that element was not met by Mr. Feldman. And I agree. And I said, submit to the court. That's the easiest, perhaps basis to address the merits of this case. First of all, temporal connection was only one issue that the district court looked at. And I agree with your honor that it seems highly implausible that a corporation would sit around for 15 plus months to look for an excuse to fire its president. It's just not likely. And there are many cases out there, some of which are cited in my brief, which say even three or four or five months is too long of a connection in time for there to be any causation to be inferred here. We have 15 plus months. Second, the district court noted that there was no direct evidence of a contributing factor decision. There's not a single witness who came forward and said, I heard one of those outside directors tie this termination back to alleged protected activity. There's not a minute about it. There's not an affidavit about it. There's not an email about it. There is no direct evidence whatsoever. Excuse me. Likewise, there's no circumstantial evidence. Um, as the court noted, there was a, a long history of adverse feelings between the outside directors and these two individuals, Mr. Perry and Mr. Feldman. So to the extent that they were frustrated with him at any point in time, that predated the alleged protected activity and is not because of the alleged protected. He was in, uh, cooperating with the federal authorities, didn't they? The only federal authority that they knew he talked to was department of commerce. And that was early 2008. His communications with that body stopped spring of 2008. So again, that goes back to the temporal connection that there's no evidence. He, they were mad at him for talking to the department of commerce, but there's certainly no connection to the termination a full year later. Um, and finally there were the critical intervening events that the court noted. Um, it's not every day that a president can tell board members you need to step down. And even Mr. Feldman conceded in his deposition that he knew just prior to his termination, that those outside directors believed he had thrown them under the bus with their biggest shareholder, Mr. Wortley. So you can see a very strong pattern of insubordination occurring over the summer, over the summer of 2009, which was discussed at the August 10th, 2009 board meeting and then culminated in his termination at the August 27th, 2009 board meeting. Mr. Carter says we should view all of these facts, including which minutes to accept, uh, in the light, most favorable to his client. And under those, uh, facts, it would indicate he reported this to the board. And thereafter the board undertook at his first opportunity to terminate him 15 months later. Obviously I strongly disagree. And he has the burden of showing a contributing factor. While that may not be a high threshold, he has to make a connection. And other than Mr. Feldman's pure subjective speculation, there's nothing in the record evidence that ties his alleged protected activities in spring of 08 to the termination, August 27th, 2009. There's absolutely zero testimony, emails, documents, minutes, anything that ties the two nation is that he was basically, uh, talking to the Wartley's negatively about the board, but in the light is favorable to the, to his client from his perspective, then that just didn't happen. That they did not talk unfavorably, uh, to about the board, to the worthless. What the, the employment law cases say is what matters is the perspective of the employer. And even Mr. Feldman admits that the perspective of the employer was that he had thrown them under the bus. Those were his words with the largest shareholder, Mr. Wortley. So whether the board was correct or not, there's no evidence that it's belief that he had disparaged them was false. Moving that headquarters from Youngsville, which is the place that's owned by Mr. Carrington, who had been to jail and, uh, and moving it to Raleigh instead. And he says, that was just a prudent decision to make. Uh, it saved him money. It was what he put, the way he put it saved him $79,000 in money. And why wouldn't you move it from that location to the other? And yet that was considered to be, uh, an adverse, uh, action. Your honor. I agree with your synopsis a minute ago when talking to Mr. Carter, that this case really seems to stem from some resentment by Mr. Feldman toward Mr. Carrington. It has nothing to do with, but it wouldn't give the board the right to retaliate against him for, for making a complaint. I mean, yeah, he could be, they could have the most bitter dispute. And I submit this does sort of fit the sort of things that television shows are made of, uh, when you read it initially, but, uh, but that's not a basis to, to retaliate and fire someone. If, if that is the prima facie case is what we're talking about. The basis for a prima facie case for it. If he has made this report and they retaliate against him by ultimately firing him. Correct. Your Honor. And I think the district court got this right, but there was no proof in the record of retaliation between those events in spring. Oh, eight and his termination, August 27th, 2009. Did they fire him over the move? I don't think that was the ultimate cause. I think the record evidence shows that it was the Wortley issues that caused the termination. That was simply part of the part and parcel of the history of bad feelings that had preexisted. Even the, the alleged protected activities. Was it a smart move to move it? I submit. No, because the board at the November one, 2007 board meeting express explicitly told Mr. Feldman do not move headquarters. He chose to ignore the board, chose to move headquarters to a whole nother city board. Didn't even find out about it until after it occurred. So was that the reason for his firing? No, but it's part of the history showing the bad blood between the two factors on the board leading up to the termination. A full year later. Great. So again, your honor, I believe that the fourth element has absolutely no support in favor of there being any kind of, any kind of reliance on the protected activities to, to cause the termination much later. Bad blood. And you obviously would talk. Quite a bit about the bad blood on the side of Mr. Feldman. But what about what, what bad blood do you concede then existed with the outside directors? What was the source of that? I think if you start with the November one, 2007 board minutes, you'll see that there was some frustration with the outside directors over what they believed was Mr. Feldman seeking a sweetheart deal in terms of a severance package and a written employment agreement. And the district court even mentioned that in its ruling, that part of why Mr. Rand hired attorney Finkelstein was to come in and deal with some of the hostility that was existing on the board. And some of the concern over the fact, Mr. Feldman was pushing for a written employment contract. So that was one of the early issues. The other issues include the moving of the headquarters right after the board told him at the November one meeting, do not move without prior permission. We're instructing you not to. So there were a number of issues where they weren't seeing eye to eye. And again, that was part of why chairman Rand brought in the new attorney, Mr. Finkelstein to assist with issues in terms of board governance. So the issue on appeal deals with this contributing factor. If we hold in your favor, is there anything else for us to review at least on a contributing factor or any other issues presented for review? Not on that fourth element and your honor. Again, I've submit there's no evidence it's pure speculation by Mr. Feldman, regardless of whether you look for a huge amount of evidence or even just a snippet, there's nothing there other than his own speculation, tying his activities to his termination. Let me put it another way. If we rule in favor of the appellate here, that there was enough of contributing factor, what then do we do? Is it then our task then to remand to the district court to consider those issues that it did not consider, including the ones they assumed and that sort of thing? Or do we decide the other issues? I think that's the court's prerogative. You could decide it. And I think for example, on the ... So by saying that, when you say could, you mean it has been properly presented to us for review, the other issues. I'm not sure of that, but you seem to be saying it is. And that makes me pause. Well, I'm not sure either. And here's an example. The district court purported not to rule on the second step of the analysis of whether the entity, LEA, would have taken the same action regardless of alleged protected activity. Although it purported not to rule, in the very paragraph it went on to say LEA had substantial reason for terminating Mr. Feldman and that it wouldn't second guess that decision. So this court may want to address whether in fact a ruling was issued on that second step, that same action step. And if the court chooses to address that, I think there was ample evidence that LEA would have taken the same step in terminating Mr. Feldman, regardless of whether he engaged in alleged protected activities 15 plus months earlier. Again, the district court said it wasn't ruling, but then went on and commented very strongly about what it believed LEA had as good grounds to do what it did. I think there was, there'll be your burden approved. It'd be shifting to you then. Correct. And I believe we did your honor. I believe there was ample evidence in the record before the district court about how his insubordination over the summer of 2009 was a legitimate basis to fire him, having nothing to do with alleged Sarbanes-Oxley protected activity. Directors want to continue relationship with Carrington seem to be, it seemed to be inconsistent with good practice of corporate operations. I don't know that there's any evidence that, that there was a continued relation. He stepped down from the board evidence of that. You mean the plaintiff didn't, the pellet didn't produce evidence terms of they're still communicating with him. That's not that wasn't before that. I'll tell you what was before the court that he stepped down from the board. He no longer had an employment position. His only role was as a shareholder. So I'm sure in his role as a major shareholder, there were some interactions. In fact, he was about to sell off the majority of stock to Raymond James. So yes, there, there was some interaction on that front. He also had an office in the same building as LEA. So there were some passing communications as noted in our brief, but there's no evidence of any other ongoing relationship beyond that, behind the, beyond the shares being held by Mr. Carrington. And you did not at the, uh, the outsiders were eating information to Karen. That's right. Your Honor. Wasn't that alleged by the appellant? It was alleged to not support it. The appellant has alleged many things that were not supported in the record. Everything he said is not supported in the record, but everything you said it is. Well, negative of it is supportive, but the positive, what he says, I believe I can point to, to record pages where there was discussion about the communications that Mr. Carrington being related to him being in the building or relating to him owning shares. I don't know of any other record page that talked about an ongoing relationship with Mr. Carrington. Other than that, um, I will point out that the ninth circuit in the Kim versus Boeing case did take the opportunity to go straight to that second issue. The, um, would the weather, whether the employer would have taken the same action regardless. And it said, I'm not even going to address whether there was a prima facie case. I find there's enough evidence of insubordination to grant summary judgment or affirm summary judgment purely on that second step. And so the court did. So, um, that was also the case with the sixth circuit and the riddle decision and riddle. The sixth circuit found that there was ample evidence in the record of questionable judgment by the individual who'd been fired. And the court said that alone would have supported the termination regardless of adverse, I'm sorry, regardless of alleged protected activities. And I, I'm sorry, I see I'm out of time. I apologize. That last issue is the one that district court said it was not ruling. And then in my opinion, went ahead and made comments that seemed to be along the lines of a ruling. Thank you, your honor. Mr. Carter, you have some time reserved. Thank you, sir. Let me race across the rooftops here. Um, uh, just on this, on this point about, um, Mr. Feldman's, uh, evidence in the case, uh, regarding the dealings with Carrington, that the, the evidence is his eyewitness testimony that he saw immediately after the disclosure on December 27th, that he saw the lawyers in there together with Mr. Carrington. And, uh, granted, he didn't hear what they said, but it was, you know, speculation. Well, okay. But it's, it, uh, a jury is entitled to speculate about that fact. Um, this is, yes, it's after the Raymond James, but it's immediately after the board, uh, meeting on December 27th and his criminal attorney is in there. Um, uh, also, we also have the fact that the jury is entitled to speculate what the conversation was. Well, I think the jury, did you say that? I, what I meant is the jury, the jury is, well, I didn't quite mean it. What I mean is the jury is entitled to weigh that fact, weigh that evidence, which is that nonverbal communication. And you have no reason to know what it was. We have the fact that the meeting right afterwards, we also have the fact that he told just days later told, uh, department of commerce. And then there was the raid. We have, um, the, uh, the part about the, um, uh, I want to get to the other points about. Make sure it is pronouns. You say, he told the department, you mean your client Feldman? That's right. Yes. Then, then we have other circumstantial evidence. Counsel, uh, uh, pointed out that there's no direct evidence. Well, very rarely do people say I'm firing you because you engaged in protected activity under socks. What we have though, is we have, I'm firing you because of your bad performance. What bad performance he's got great performance. I'm, I'm firing you because of insubordination. What insubordination? Where's the rec? Where in the record is there indication of his great performance? There, the record evidence is that 260% increase in sales. His last, um, based on one large sale. True. And also the last quarterly report is. Well, that, I think my client still gets the benefit of it as CEO. He, he, but a census is doing census and comes in and hand you $7 million. And he gets the credit for that. That would have happened whether or not you could have had Mickey mouse is the head of that corporation in that situation. But the, but the fact is that he, he was, they were there in the right place, right time. And sales were up. The stock had been in continual decline the entire time. Uh, Mr. Feldman was, uh, in charge there. My point though, is that, is that right? It's a penny stock. So the, the fact that the company is not, um, you know, the company's got the Wortley's to contend with. There's a lawsuit out there. It's a publicly traded company. That brings me to another point. Your honor asked about the employment agreement. The Amex was saying that it was unusual for a CEO of a publicly traded company, not to have a contract. So that, that contract was a requirement that they, that they thought they had a little golden pension plan that he wanted. The board agreed to. Well, what he wanted, what he wanted was he wanted to severance, uh, in, in the case after building up this company, he wanted severance in the case they were to get rid of him. Um, you could understand why that would be a legitimate contention between the board and the CEO. Correct. Well, my point is that, that again, when they, when they say that the reason we got rid of him was because of insubordination regarding the Wortley's. Remember the Wortley's have enough power as shareholders to put this company under and he's going and figuring out the Wortley's, uh, problem. He's the one who in April of 2009 is getting the Wortley's to the point where they're not going to sue. And he's solving the problem. That's what a good responsible CEO does. The Wortley's want to either replace these members or become on the board themselves. And the response of your client during that time period is to go to the board and say, you guys need to resign. No, it's not good. No, that wasn't it. It was, it was, I met with the Wortley's. I think I can get a deal with the Wortley's and Wortley wants to come on the board and he doesn't, he, he wants you guys to resign. That's what he said. He's reporting. He sent a letter to him himself saying you should resign. Yes, that's right. He's reporting. That was his letter saying you guys need to resign. This, this is true, your honor. And my point is though, he's reporting what the Wortley's have said. And this is their, these are their terms to solve the problem. Again, this is what a responsible CEO does to, to a board to say, look, we've got a problem here. We're out of business. If the Wortley's want to put us out of business. Um, I want to just point one last thing about, um, uh, the, um, uh, with when the burden shifts your honors, uh, question council about if, if we assume, you know, what should we do? I think you're, I think the court can, uh, shift the burden to the, uh, to the, um, defendant here and ask, have they met the very, very high standard of clear and convincing. And what we know is that summary judgment is not available. That issue on appeal. I don't, well, the, the judge down below, uh, I agree with, with, um, council that the judge down below did not address it under socks, but then under, yes, your honor. And, and I think what council's picking up on is the McDonnell Douglas shift. He then goes and says it was legitimate, that legitimate business reason that is McDonnell Douglas language doesn't apply here. What applies here is clear and convincing. And as the 10th circuit has just instructed third circuit, that's a very, very high burden. And, um, it's ruled on it and a rule in your favor on a contributing factor. We send it back. He, he that's, that's certainly available. That's right. Thank you. Thank you very much, Mr. Carter. Uh, we'll come down and greet council.
judges: Roger L. Gregory, James A. Wynn, Jr., Stephanie D. Thacker